Today, 18-11519, U.S. v. Eustice, Mr. Nunn. Welcome back. Thank you. May it please the court, good morning. My name is Randall Nunn. I represent the appellate in this case, Brandon Shane Eustice, who is here appealing his 84-month sentence following a guilty plea for conspiracy to possess, with intent to distribute, methamphetamine. My argument will focus on primarily two areas from my brief. Issue three, which is the one having to do with maintaining a drug premises, and issue four, which is an error in criminal history, normally wouldn't be significant, but I think in this case it moves his criminal history category back one, so that is helpful to him in a number of ways. Mr. Eustice was sentenced based on a offense level, total offense level of 27, criminal history category of 4. His guideline imprisonment range was 100 to 125 months. He was sentenced on November 13, 2018 to 84 months after he got a variance downward in the sentencing, and so that resulted in 84 months. The first issue I'd like to... Mr. Nunn, before you get to that issue, I just want to get your position on the drug quantity, which is one of the issues you raise. There were two, as I understand it, two primary persons with whom Mr. Eustice allegedly dealt. One of them was a Mr. Boone, and in his objection to the PSR addendum, Eustice stated that Eustice does not dispute the statements of Boone, which would include the amount of methamphetamine, so are you still pressing that point that you challenge the drug quantity, or do you think the point is waived through, or do you think Eustice waived that point by saying he doesn't dispute statements by Boone? Well, I think Mr. Eustice did say that he thinks Mr. Boone's quantity was correct, much as I might have tried to dissuade him, so yes, we stand by that. I think the other person... But do you waive your drug quantity point on that basis? No, sir. All right, thank you. But as to the other one, in the same second objection to the addendum, he did accept that half of Murfield's amounts would be countable. Do you recall that? He said, I'll take all of Boone's, yours, and half of Murfield's. Yes, he did say that, so I think that's something we stand by, yes, sir. You stand by meaning you accept that drug quantity calculation, Boone's amount, and half of Murfield's? Yes, we would. Okay. So your objection, if there's any left, as to drug amount, could you just, before you get to your other two issues, what exactly is the nature of it? Is it that personal use should have been subtracted? Is it there shouldn't have been a multiplier, or is it that there's some unreliability even given his statements about Murfield? I think, Your Honor, there is some unreliability even given those statements, and I think our focus is sort of from two directions. One that's probably didn't get as developed in the PSR at that time frame, and that has to do with, if you look at 841A1, it says that it's unlawful to distribute, dispense, control of substance, and it doesn't say anything about possessing it or that sort of thing. It's focused on distributing. This is your argument that he was charged under 841A1. So then the question I think arises, is that the wrong charge if you're looking at quantities that he didn't, let's say that it is established that he didn't distribute them. Then he was charged with something, and the quantity that he was charged with, they don't match. So it's kind of two elements involved in that. And the 841A1 is just a statutory thing. Is the charge correct? If he's charged under that, then you'd have to say, and one of the reasons that comes up in the government brief, I think that they admitted that the quantity included amounts that were not necessarily distributed because they were personal use amounts, but did not get into the issue of the 841. We had raised the 841A1 thing, and there was never any response, I don't think, really from the government on that issue. And I kept pressing it because I think that's a significant issue because if you look at that statute, you say he's charged under that. And the government said that it's the amount, I was looking for the language, the amount that he delivered. I think that's the word that they used. In the PSR, paragraph 25 of the PSR talks about the amount that he possessed, I think, and delivered. Well, he didn't deliver, if you look at that, he didn't deliver that quantity. He delivered 30% less than that quantity. We submitted a declaration by Mr. Eustace in which he swore that he was a meth user at the time of this offense. He was a daily user, one gram a day, I think, type use. So I think the government did not dispute that. So I think that that aspect is agreed that 30%, and there's that evidence from that declaration or affidavit in the case. So I think that stands that the quantity is 30% less than it was. So when the government says delivered in the PSR, and the court adopts the PSR and takes that, I think then that helps the argument that we're making. Okay, if you're going to look at it and say that it's the amount delivered, he didn't deliver that. So the 841A1 comes back in again, but it's a little bit different because it's sort of a statutory thing. He's charged. Now, at the end of sentencing, the judge said, this is the correct sentence based on the sentencing factors, etc., etc., etc. But if not, if there's any error in this sentence, I would still impose the same sentence, meaning the guidelines are advisory only. So I've made some adjustments in favor of this defendant as well as against him, and I would stick with it even if there's some error. How do you respond to that? Right. He did say that in the sentencing. The statement of reasons that he filed with the judgment did not say that, had nothing at all in the statement of reasons. The last paragraph at the end of it usually looks at those issues. Many times you will see if a judge has made that statement, that plugged in right there, saying this is the same sentence regardless. That was not there. So I think that throws somewhat into question, should the statement of reasons say the same thing, essentially, that was said in the courtroom on the day of sentencing, and it didn't. I think the other question, we don't know what the guideline range of imprisonment was. I mean, he didn't specifically say what it was, and if he was wrong and it was X instead of the sentence of 84. We don't know whether he would have looked at that and come to the same conclusion for the same reasons. He sort of seemed to focus on criminal history somewhat. Well, one of the issues in our brief had to do with the criminal history, for example, issue on one of the offenses, which was a two-pointer. Normally that wouldn't matter that much, but the court corrected to one point. The talismanic language that a district judge has got to do to insulate it based on harmlessness is say, even if you, defense attorney, are right as to the guidelines, I would still get to this point with a downward variance. But he didn't say that, that that's your point. He didn't actually contemplate what might have been the correct guidelines. Right, right. And is the government pressing harmlessness, to your knowledge? To my knowledge, no. Well, I say to my knowledge, no. I did get a communication from government counsel saying that if it comes up, that the position would be, I think, that it may be harmless error. And he sent me a communication a couple days ago and some cases. So yeah, that came up, but prior to that it really didn't. There was nothing in the papers prior to that. Well, just a recording, he said, further, even if I'm wrong as to any of my rulings on the objections in this case, this is the sentence I otherwise would impose after taking into account the facts related to the underlying offense, as well as the defendant's criminal history, which dates back to convictions when he was a juvenile. I just think that the guidelines being advisory, that has some weight. Yes, sir. Well, I think one of the issues that we have with that is that the lodestar or the key issue, I think, is whether the judge would have done the same thing with the calculation and was the calculation mentioned as to what his calculation would be, and that when he doesn't, you're missing some of the explanation for his reasons to be able to know how to address that. And I think that was not very clear at the sentencing, in our opinion, as to what he felt the alternative sentence would be, what it would be based on. And so I think there's a question from that standpoint, did he offer enough of an explanation other than just say same sentence regardless? There are some courts that look at that and say, well, you have to be careful, because that's a talismanic thing where the judge says magic words, and it sort of insulates that case from a likely successful appeal when you do that. And so I think a lot of courts look at that very carefully, and I think here it was somewhat abbreviated, and then it wasn't in the statement of reasons as one of the reasons that he would do the same thing. Now, I know that the oral sentence normally would control, but in this case it was somewhat confusing. And what sentence, alternative sentence, was he looking at? At criminal history and also the offense levels. And I think in our case we would say that the offense level was at least two levels too high, probably four levels too high if you look at the enhancement. And we would say the criminal history category, if we're correct on this criminal history issue, instead of a two-pointer, it's a one-pointer, which normally is not a big deal, I don't think. But it moved him back. That would move him back one criminal history category, and that does make a difference in what the guideline range of imprisonment would be. So it could go all the way down to, I think, 70 months. The other thing that I think throws it into a little bit of confusion, the sentence that he gave not being in the statement of reasons, it's not clear what he really intended by doing that. So we don't know. You were the lawyer in the district court, and you had given an extensive recitation as to your objections, et cetera, et cetera. So he had all of those before him. But why don't you move on to your other issues? Okay. The other issue on the criminal history issue, I'll be brief about that. The PSR assigned two criminal history points for one of the prior offenses. It was a state, Texas state case, fraud in the use or possession of identifying information. The two points apparently were incorrect, certainly in our view. 4A1.2 of the sentencing guidelines says that a diversionary disposition resulting from a finding or admission of guilt in a judicial proceeding is counted as a sentence under 4A.1c, which is a one-pointer. In researching the issue, there wasn't much out there. I found one case from the 11th Circuit, a fairly recent one. I think it was a Baptiste case cited in a brief, and it was 2017. In that case, they looked at it and they discussed it in some detail, and they said, yep, that's correct, that should be a one-pointer because it was a sentence in that 4A1.1c should have applied to, which would have been one point. Well, if you take the one point, he was at the bottom in the higher criminal history category, so it moved him back into another one. Now, there were a couple other things that we thought about challenging that wouldn't have made any difference. It still would have been that same category. But what it did was it moves his guideline range of imprisonment back, and if you take two levels down for the maintaining of premises, then that affects it too. So we think it was significant for that reason to move it back, and it needs to be considered. And since we raised it in the brief, I felt that that was an issue that needs to be brought up here because I think the question is what is the guideline range of imprisonment, and it could be a couple of different ranges. Now, the district court did not address that, and I understand very often they don't. They just don't have a lot of time to go into a lot of detail, but it wasn't addressed at the sentencing hearing. So for that reason, I think it's something that needed to be brought up because it does affect the sentence, the reasonableness of the sentence, and we objected to both procedural and substantive reasonableness at the sentencing hearing. The premises issue, maintaining of premises, I think was quite significant in this case because it was fairly clear that it was based essentially on hearsay that there were some law enforcement officers that it was generally known, it said in the PSR, something to that effect, that this was a place that was used to store and distribute drugs. Well, it wasn't known by whom. When they went in, though, they did find drug paraphernalia. Yes, sir. The interesting thing, they did two searches of his residence. This was a residence. He was fully employed. The house he was renting from his employer. They went in twice. One time they found, they said, an unknown quantity of drugs, and it was never said anywhere what that quantity was. The second time they went in, it was about two months apart, they found eight-tenths of a gram gross weight of methamphetamine, and they said, well, we found drug paraphernalia. We found a glass pipe in one case, and I thought that was somewhat interesting because the things that they found, they said it was a glass pipe, a sandwich-sized baggie with methamphetamine. Not that you would think if this is a place to store and distribute drugs, you would find maybe a lot of baggies to put drugs in to distribute. You would expect that for a place where it's stored, but it was a baggie and a glass pipe. Well, that's just as consistent with personal use, and he was a personal user. But there were the Murfield texts that Murfield delivered to his house in small ounce amounts. I'm sorry? The texts from Murfield, which the government offered and the PSR relied on, was that Murfield would deliver directly to the house. Correct, or no? Was it Murfield going to the house? Yes. I don't think there was any evidence of that. I think the evidence primarily seemed to be text messages back and forth during a period of time. The difficulty with text messages, I think, is unless somebody confirms that with actual surveillance, watching the place, and to my knowledge there was nothing like that, text messages are very incomplete because you'll have messages going back and forth and you don't know if this one's ever been answered, if this one was ever acted upon. So it's a very difficult thing to look at text messages and come to any conclusion. I don't think that there was any surveillance on him. I think the government at one point— Counsel, you're ready. Thank you. But you'll have rebuttal time. Thank you. Thank you. May it please the court. Brian McKay on behalf of the United States. Counsel, on the drug quantity issue and whether there's sufficient in-district reliability to support that in the PSR, I think someone will correct me if I'm wrong, but I heard no objection as to the amount from Boone. And I heard no objection also as to some of the amount from Murfield, maybe half of it. So it seems to me that what's at issue then is part of the quantity that's attributable to Murfield. Is that right? Yes, Your Honor. I believe that's correct. Now I'm looking at the PSR, but I have a question. Is all of the amount that is attributable to Murfield, the 10 ounces, is that coming from Murfield himself? In other words, is that as a result of a police investigation in which they're talking to Murfield and he's giving them that information? Alicia Murfield was a cooperator. This information did come from her and was corroborated. But I would submit that that 10 ounces alone, that is supported by the text messages that Your Honor Judge Higginson referred to. When we look at pages 120. Well, additionally supported. It's also supported by testimony. Absolutely. And what I want to point out is those text messages between pages 122 and 139, those alone by my calculation could support a drug quantity of about 11 1⁄2 ounces. And to the point of whether there's some. How are you doing that extrapolation? Absolutely. What I see when I go through it, I am finding about 27 or 28 distinct conversations. There seems to be a starting point and an end point. In about 20 of those, there seems to be an issue of an actual transaction that occurs. In the prototypical instance, Mr. Eustace reaches out and says, hey, can I get a half or I've got $200. Can you bring me something for that? And she may say I'm going to need a little time to get from my source or she may say I'm tied up with somebody. But then that, in the prototypical example, ends with her somehow indicating some manifestation that I'm here, I'm going to do this. Oftentimes she just finishes with here, meaning I'm here, come outside and get your drugs. Or I'm right around the corner, I'm a few minutes away, something like that. You do need Boone's amounts to get to the amount the PSR attributed to you. I don't have to have them. He did stipulate to that. My question on that is, am I right that the first time you pointed that out was in the 28-J letter? That's correct. So that's a fairly salient point that would have been helpful to draw to our attention. I agree completely, Your Honor. And you know we're very strict on defense attorneys with waiver. So why wouldn't a first-time argument made in a 28-J letter be one that's waived? Because of two reasons. Well, first, I think that the court can affirm on any basis supported by the record. It's well established. But two, even if the court was to disregard the amount by Boone, the amount that's supported with Murfield, that alone, the court applied 10 ounces. It could have tripled that amount and still been supported on this record. The 51-day window that we get to peek into their text conversations in July and August of 2017, we know that's not exclusive of their dealing. It may set a pace for their dealing. But from the very beginning on page 122, the first thing that Mr. Eusta says is, you got anything or you got something, and she responds. So what's our best case on when we can extrapolate or use a multiplier? If we got a little peek at a specific time and, therefore, by a preponderance, we can say there must have been a lot more. I think in Bettencourt the court did that. It affirmed the district court's use of one sort of customer and extrapolated to other customers. Because back on the point, if he hadn't conceded in the addenda, you have a PSR paragraph that describes multiple sources but doesn't attribute the knowledge to any one. The agent's told us, the co-conspirator's told us, and we've corroborated that with reference to other documents, none of which are attached. Correct. And knowing you, you're well-prepared. How does that harmonize with cases like the Narviz-Guerra case, where we say that generally the protection, as I understand it, for a defense attorney, when the probation officer says, here's a huge amount of drugs that we're going to attribute to you, and we know it's that amount because we've looked at lots of sources, but then they don't say the specific sources. Usually, if you attribute it to a co-conspirator, then the defendant can call that person at sentencing. But the trouble here is the grad bag issue. Now, one answer is, well, factually, in this case, he's conceded it and it's done. But that wasn't in your brief, so I was very concerned. Do you have an answer to my anxiety? Yes. I think the court can take comfort in the drug quantity established here because when we look at the text messages alone, we know that it is not exclusive. He stipulated in his factual resume that he participated in this conspiracy for a period of 10 months, from March 2017 to January 2018. We have a peak of 51 days during that period. We know that their dealing preceded it because their very first conversation, she's asking, do you want the same thing? We know that it preceded. We also know that it postdated our peak into their conversations as well because it ended, our view into their conversations ended in August, and by his stipulation, he continued to participate in this conspiracy until January. And yet, for that 51-day window, we can substantiate about 11.5 ounces on that alone. And I think that if the district court had tripled that amount to account for that September through January. This is helpful to me, and it's case-specific. Just to abstract for a minute, if we didn't have the text messages, would you agree with me there would be difficulty for us to affirm if the PSR had just said, I've looked at a lot of sources, and here it is? I think that that would be a, I could understand that the court would have more discomfort in that situation. Here, the quantity that was applied was both reasonable and, as I explained, a very conservative view of the amount of the, or sort of the magnitude of the offense that Mr. Eustis engaged in. Now, if we were to disagree, you didn't assert the brief harmlessness based on the 3553 statement at the end. Is that because of Ibarra-Luna and law that requires more than what this district court said? Or is there a letter that you sent saying that you do intend to argue harmlessness? No, Your Honor, to be precise, in preparing for argument, I did see the district court's remarks. I did note that it was a below-guideline variance that the court imposed. And perceiving that the court might want to discuss that, I hadn't planned to raise it. It wasn't in the brief. I consulted with the brief writer. I think that was simply an oversight. But recognizing that the court might want to discuss that. You know better than to make a comment like that. I'm sorry, Your Honor. I just wanted to make clear this was not an affirmative waiver. There was no judgment made that we can't establish harmlessness here. I'm sorry. I really don't mean any offense whatsoever. You're still outside of the record. You're in Batesville. I'm sorry. You don't know where Batesville is. I do. I think Southwest, if I remember. It's outside the record. Dallas. But, Your Honor, recognize that in the record. I didn't want to ambush counsel. I did on Monday afternoon send a packet of cases that simply stand for the proposition that the court has recognized its ability to sua sponte, analyze harmlessness on its own. And, of course, the court can affirm on any basis in the record. So I hadn't planned to argue it affirmatively. But if the court asked, I certainly want to give the court that option. Now, I've long said, and our brief says, and I'll stand on it, that the court need not assess harmlessness. But let me make this clear. So on Monday of this week, which was the second, you provided something to the court on harmlessness vis-a-vis the judge's comments about it would be the same sentence? No, Your Honor. I didn't provide anything to the court. I'm glad to supplement with a 28-J letter with the citation of those three cases, or I can read them into the record here. But I did alert counsel to that, that if the court wished to broach that subject with me, that I did plan to include them in my response, or I might include them in my response. I just didn't want that to be a surprise to counsel. I thought that was the best way to handle it. I figured a 28-J letter on a matter raising something new that the court, three or four days before the court, if the court wanted to talk about it, I'm prepared to do that. If the court didn't bring it up, I was prepared to leave it at that. Turning to the premises enhancement, I think there are two aspects of this particular record that support the finding that a primary or a principal use of Mr. Eustace's home was for drug distribution activity. The first aspect is I would point the court back to those same text messages that establish that he was receiving these drugs from Ms. Murfield at his home. They do conclusively establish they were going to his home. Of the 20 or so transactions that I find substantiated in the text messages, 10 times he is explicitly telling her where to go, where to deliver the drugs. Seven of those 10 times he is at home, and he's saying, bring them to me here at the house. One time he's at an apartment complex. That was a two-ounce transaction. He's saying, I'm here at the apartment complex. But he's also saying, oh, and by the way, can you give me a ride home? So he's using her also to give him a ride home. I think it's plausible, reasonable inference that at that large a quantity, two ounces, she's bringing him to his home and also taking him the drugs but then taking him and the drugs to his house. Then there are a couple of instances where he's at work and then he's at home on a lunch break, and the record simply doesn't say where he is. In one instance, I don't think a transaction was consummated. But seven of the 10 times he is explicitly saying, bring them here to me at home. I think for those other 10, when it's not explicit, I think it's plausible and a reasonable inference that they've established essentially a course of dealing so that when nothing is said, when he says, I have $200. Can you bring me something? And she says, I'll be there in 10 minutes. The plausible, the reasonable inference is that they've established this course of dealing. It is at his house. These text messages show that on average two or three times a week, he is receiving distribution, drugs for redistribution at his home. The other aspect of this record is at page 147 where the PSR details those two instances where police went to his house. In September 2017, we're a month removed from our window into their conversations, a month later police go to his house with a search warrant and they find the unspecified amount of methamphetamine, the drug pipes. But importantly, they find digital scales. And that's something that sets apart a pure user from someone who is then breaking it down for redistribution. Police find those scales at his home and the PSR says that they seized those scales. Less than 90 days later, police return to his house, this time with an arrest warrant, arrest him. Again, they find a small amount of methamphetamine and drug pipe. But they also, again, find another set of digital scales with residue on them. And I think the inference to be drawn from that is still during this time period, September to December of 2017, Mr. Eustace is still engaged in receiving, storing, and repackaging, preparing drugs, breaking them down into smaller quantities that sell to his users, his customers. And those activities are occurring in his home because that's where he's receiving the drugs, that's where he has his scales that he's using to break them down. That premises enhancement is well supported by the record. And I think one of my best authorities for that is actually the court's unpublished decision in Rodriguez. Not because of its similarity to this case, but because of the contrast. There in Rodriguez, the defendant was enhanced on the premises enhancement based on one possession of about two kilograms of methamphetamine, a lone instance. And that gave the court pause. It noted that this was a close factual question, whether this one time of storing drugs at his home could support that enhancement. But this is not a close question. The story that these two aspects of the record tell, where he is two or three times a week receiving distribution quantities at his house, breaking them down at his house, that supports a finding of frequency that the commentary directs the court to consider and supports the premises enhancement in this case. It's very well supported. It's certainly plausible to believe that the drug quantity involved in Mr. Eustace's case was at least 14 and a half ounces and that he used his home frequently as a primary or a principal use of his home was for drug distribution activities and would submit that there's no clear error in those two instances. I plan to largely rest on the brief on the last point, but I will say that with respect to the criminal history issue, this court has decades ago given guidance as to how we treat a Texas deferred adjudication for purposes of 4A1.2A, B, or C, or 1, 2, or 3. That's really beside the point. Once that conviction or once that deferred adjudication, the fraud deferred adjudication, once it was revoked and it turned into a sentence of 255 days, Section 4A1.2K would direct the court then to treat it as a sentence of imprisonment of a length that includes the revocation sentence, that 255 days. Of course, I think it's B1 or A1. It then scores out two points. That's precisely what the court did here. There is simply no error. I don't think Baptiste or anything like that has really any part to play here. Unless the court has any other questions, I would ask the court to affirm, and I will cede the rest of my time. Thank you. Thank you. Mr. Nunn, a follow-up? Mr. Nunn, I heard a suggestion of waiver by the government for not talking about your client's concession about the amounts attributable from Boone, but I'm looking at your brief, your opening brief here, and I'm trying to find what in your brief would have prompted the government to talk about Boone. What I see here is an argument in your brief about quantities, and I'm looking at page 11 of your brief, records devoid of any corroboration of drug quantity estimates used against Eustis, and in particular those of Merfield. So my question is, in your opening brief, are you trying to take back the concession with respect to Boone? Are you making an argument with respect to the Boone amounts? Or are you only arguing about Merfield? It was on Merfield, Your Honor, but I think Boone is still important because of the 30% issue and the 841A1 issue. I think if amounts delivered are what you're looking at, then I think even Boone's. In other words, the client said, yes, I think the amount that Boone said is probably about right, but that still doesn't cover the question about the 30% and A1 issue, 841A1. And as to Merfield, do you agree that the investigation that resulted in the 10 grams from Merfield, was that based on a statement by Merfield? Not to my knowledge. I don't think it was. I think it was a combination of different factors that it was based on, and I think that was one of the things that I think the government, when they responded to our objections to the PSR, the government's response, which is in the Record 179, they said on two separate occasions, Eustace was in possession of methamphetamine at his house. Well, those two occasions were the two searches in December, and I think one in a couple months before that. In your objection to the PSR addendum at page 197, you say there are no individualized statements of any confidential sources or corroborating co-conspirators confirming or corroborating the amounts of Eustace's distribution. There are statements only of Boone and Merfield. So it was based on statements by Merfield. Well, I think there were statements by both of those, I would assume, to the investigators, but we never saw what those statements were. There was never any testimony at sentencing. There wasn't any affidavit statement, so we don't know. So you think an investigation into drug amounts based on a statement by a co-conspirator lacks sufficient evidence and additional reliability? Well, I think when we raise an objection to it, a specific objection, I think at that point that needs to be resolved by the district court somehow, and I think you could either have testimony, and I think the cases don't really distinguish, in some cases in this circuit, whether they're talking about whether there was testimony under oath. There are cases I'm familiar with in the Ninth Circuit, Seventh and Eighth, I think, as well, that say that it's not a statement by someone that's not under oath, that's a co-conspirator, it's not a reliable statement. Now, I know there's contrary sort of cases in this circuit, but I think that those cases don't really show whether there was testimony. So in RICO we said statements by co-conspirators are sufficiently reliable to form the basis of a finding. Right. Well, that would be our view, and I think the cases in this circuit that you look at to try and determine that issue, you cannot tell in many of them whether there was any testimony under oath at all. I think the assumption is, well, there may have been, but you cannot tell that. There are other circuits that will say if you don't have it under oath and it's a co-conspirator, that is not reliable. There are a couple of circuits that say that, essentially, and so I think that's our argument here. We can't tell from these whether there was any statement ever under oath by any of these people. Thank you, counsel. You're welcome. Thank you, counsel. The case is submitted.